

# NUMBER 13-09-167-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RAYMOND VALERO,                                      **Appellant,**

**v.**

THE STATE OF TEXAS,                                     **Appellee.**

### On appeal from the 399th District Court
### of Bexar County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Vela
### Memorandum Opinion by Justice Vela

A jury convicted appellant, Raymond Valero, of robbery causing bodily injury, a second-degree felony. *See* TEX. PENAL CODE ANN. § 29.02(a)(1) (Vernon 2003). The jury assessed punishment at eighteen years' imprisonment, plus a $5,000 fine. By two issues, appellant complains the trial court erred (1) by allowing him to represent himself and (2)

by implicitly finding him competent to represent himself.[1]  We affirm.

## I. FACTUAL BACKGROUND

About 11:00 a.m. on April 21, 2007, Margarita Flores was waiting at a bus stop in San Antonio, Texas.  Appellant grabbed her purse and got into a car parked in a nearby alley.  Juan Espinosa saw appellant get into the car and heard Flores screaming, "My purse.  My purse."  While Flores tried to open the driver's side door to appellant's car, Espinosa started beating on the car with a two-by-four.  Espinosa testified that when appellant put the car in reverse, "I move[d] out [of] the way and when I do that the car reverses like that and, boom, you just see the lady [Flores] flying to the other side of the alley, hits the fence, falls onto the gravel."  Appellant drove away, and Espinosa and his girlfriend helped Flores to her feet.  Flores received scratches to her elbow and leg.

The police located appellant at an apartment complex on Commerce Street in San Antonio.  They took Flores to the complex, and she identified appellant as the person who took her purse.  Both Espinosa and his girlfriend identified appellant as the person who they saw getting into the car that was parked in the alley.  Flores did not get her purse back, but the police recovered some of the cash that she had in her purse.

Appellant, acting pro se, called his wife, Martha Valero, to testify in his defense.  She testified that between 8:00 a.m. and 8:30 a.m. on the day in question, appellant drove their car to his mother's residence, which was about twenty minutes away from their apartment.  At 10:30 a.m. that morning, Martha spoke to appellant on the phone.  At that time, he was still at his mother's residence.  While Martha was asleep in their apartment,

---

[1]This appeal was transferred to this Court from the Fourth Court of Appeals by order of the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 22.220(a) (Vernon Supp. 2009) (delineating the jurisdiction of appellate courts); TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005) (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer).

her children woke her up and told her that the police were outside, arresting appellant.

## II. PROCEDURAL HISTORY

On January 27, 2009, the trial court held a pretrial hearing which was attended by appellant, his defense counsel, and the prosecutor,  At the beginning of this hearing, appellant told the trial court, in part, "I have experienced being reborn again" and "I was turning down God's glory and I understand more clearly.  I understand using drugs is a bad thing.  I understand."  During this hearing, the parties discussed appellant's written *pro se* motion in which he requested a jury of twelve priests as well as certain evidentiary items for his trial.  After both sides discussed appellant's evidentiary requests, the trial court stated, "He needs 12 priests as his jurors."  To this, the prosecutor remarked, "I don't know, that may be possible in San Antonio but I don't think we'll get a venire panel with 12 priests. . . ."  In response, appellant replied, "Okay."  The trial court made no ruling on this request, and appellant made no oral demand for that request.

After this hearing, the trial court ordered appellant to submit to an examination for the purposes of determining his competency to stand trial and his sanity at the time of the offense.  On January 30, 2009, Brian F. Skop, M.D., a board-certified general and forensic psychiatrist, examined appellant to determine his competency to stand trial.  Dr. Skop's competency report,[2] dated February 3, 2009, showed, in relevant part, that appellant:  (1) was never in special education; (2) left school after getting married; (3) worked as a self-employed painter; (4) had prior "charges for possession and theft"[;] (5) had been on probation and incarcerated in a state jail; (6) had a prior history of cocaine and heroin abuse; (7) had an "average range" of intelligence; (8) "indicate[d] that he would like to

---

[2]The appellate record includes a copy of Dr. Skop's competency report which is addressed to the trial judge.

represent himself"[;] (9) is "currently competent to stand trial"[;] and (10) "appears to have a factual as well as rational understanding of the proceedings he is likely to face."

Dr. Skop also examined appellant to determine his sanity at the time of the alleged offense. Dr. Skop's report,[3] dated February 3, 2009, stated, in relevant part, that this examination did not support a "determination that Mr. Valero [appellant] was legally insane at the time of the alleged incident. He appears to have had the capacity to understand the wrongfulness of the alleged behaviors, and he does not appear to have been suffering from a severe mental illness or defect at the time."

On February 3, 2009, the trial court held a second pretrial hearing outside appellant's presence. The trial court told appellant's defense counsel and the prosecutors, in relevant part:

> I wanted the record to be very clear that the Court really did not have any concerns or issues with regard to Mr. Valero's [appellant's] competency and/or insanity, but . . . out of an abundance of caution, the Court went ahead and had Mr. Valero evaluated on Friday, which would have been January 30th [2009]. It was a rush job for the doctors, but I felt that it was important because I think if you were to read the record cold, black and white, I could see where some appellate judges might think that Mr. Valero is incompetent. I have—there's no question in my mind that he's competent. He's extremely bright. He's also extremely easily agitated and I think that that's the basis of why he comes across as he does, because he's so agitated all the time.
>
> The coordinator said that the report itself would not be dictated until sometime this week but she went ahead and got a verbal indication from the doctor's secretary that Mr. Valero is both competent and sane. And so I feel very comfortable, even though I felt comfortable before, in terms of the appellate court I feel extremely comfortable proceeding with the trial.

When the trial court asked counsel for both sides whether they wanted "to get anything on the record," defense counsel said, in relevant part, "This morning at the jail he

---

[3]The appellate record includes a copy of Dr. Skop's report, which is addressed to the trial judge.

[appellant] would not talk to me. He would not allow me to cooperate with him in his defense. And he indicated very strongly in no uncertain terms his desire to represent himself." The trial court replied, that "I believe Mr. Valero is playing the system. . . ." After a brief recess, with appellant in the courtroom, appellant told the trial court, "I'm going to be representing myself." Upon hearing that appellant wanted to represent himself, the trial court elicited responses from appellant showing that appellant: (1) was thirty-seven years old and had a seventh-grade education; (2) had no specialized training in criminal law; (3) had no history of mental or psychiatric disorders or treatment; (4) had no disabilities or physical-health problems; and (5) had never been in the military. After eliciting these responses, the trial court admonished appellant that he had a constitutional right to have an attorney represent him and that if he was too poor to hire one, he had a constitutional right to have a lawyer appointed to represent him at no cost to him. The trial court advised him that he was charged with robbery which is a second-degree felony with a punishment range of between two to twenty years' imprisonment, plus a possible fine of up to $10,000. When the trial court asked appellant, "Do you understand that range?", he said, "Yes, ma'am." Furthermore, the trial court admonished him that by representing himself he would be "held to the same standard as any other attorney" and that he was expected to comply with all the "rules of court," "rules of procedure," and "rules of evidence." To this appellant replied, "Yes, ma'am." Next, the trial court advised him about what he was "giving up" by representing himself. The trial court told him that: (1) he may be waiving any defects in the indictment or other charging instrument; (2) he might be waiving error in the admission or exclusion of evidence and that he might be convicted based upon incompetent, irrelevant, or otherwise inadmissible evidence; (3) he could be giving up a defense; (4) he could lose any right to complain on appeal about the ineffective assistance

5

of counsel; (5) he could give up a right to the effective assistance of counsel; (6) he could give up the right to a legally correct charge; (7) he could be giving up the right to object to the prosecutor's arguments; and (8) he could be giving up the right to the selection of a fair and impartial jury. When the trial court told appellant, "So these are the things that I want to make sure that you understand that you could be giving those things up. Do you understand that, Mr. Valero?", he replied, "Yes, ma'am." The trial court told appellant that even though he wanted to represent himself, "I'm going to have [appellant's court-appointed attorney] here in the event that you know—that you believe that something is wrong but you're not quite sure how to voice it, he's here to help you in that regard. For example, objections or anything like that. Does that make sense?"[4] To this appellant replied, "Yes, ma'am."

### III. DISCUSSION

### A. Self-Representation

In issue one, appellant contends the trial court erred by allowing him to represent himself, because he did not voluntarily and intelligently waive his right to counsel or the assistance of counsel.[5]

#### 1. Applicable Law

The Sixth and Fourteenth Amendments to the United States Constitution "guarantee that a person brought to trial in any state or federal court must be afforded the right to the

---

[4]A trial court may permit hybrid representation in its discretion. *Scarbrough v. State*, 777 S.W.2d 83, 92 (Tex. Crim. App. 1989). As long as hybrid representation does not interfere with "the accused's actual control over his own defense or undermine his appearance before the jury in the status of a *pro se* defendant, participation of standby counsel does not infringe upon *Faretta's* guarantee of self representation, and may even be imposed upon the accused consistent with the Sixth Amendment." *Id*.

[5]Appellant is represented on appeal by the Bexar County, Texas public defender's office.

assistance of counsel before he can be validly convicted and punished for any felony."[6] *Collier v. State*, 959 S.W.2d 621, 625 (Tex. Crim. App. 1997) (citing *Faretta v. California*, 422 U.S. 806, 807-08 (1975)). "These amendments also guarantee that any such defendant may dispense with counsel and make his own defense." *Id*. (citing *Faretta*, 422 U.S. at 818-20). "The trial judge is responsible for determining whether a defendant's waiver [of the right to counsel] is knowing, intelligent, and voluntary." *Williams v. State*, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008). "Courts indulge every reasonable presumption against waiver and . . . do not presume acquiescence in the loss of fundamental rights." *Id*. (internal quotation marks omitted). To assess whether a waiver is effective, we "consider the totality of the circumstances," which means we "must examine 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"[7] *Id*. (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

### 2. Attachment of the Right of Self-Representation

"'[T]he right to self-representation does not attach until it has been clearly and unequivocally asserted.'" *Williams*, 252 S.W.3d at 356 (quoting *Funderburg v. State*, 717 S.W.2d 637, 642 (Tex. Crim. App. 1986)). "Once asserted, under *Faretta*, the trial judge must inform the defendant about 'the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with

---

[6]The right to self-representation is also protected by state law. *See* Tex. Const. art. 1, § 10 (guaranteeing criminal defendant "the right of being heard by himself or counsel").

[7]However, the law does not require that a defendant "'have the skill and experience of a lawyer in order competently and intelligently to choose self-representation[.]'" *Scarbrough*, 777 S.W.2d at 92 (quoting *Faretta*, 422 U.S. at 835). "'[N]either the defendant's technical legal training nor his ability to conduct an adequate defense are requisites for self-representation.'" *Id*. (quoting *Burton v. State*, 634 S.W.2d 692, 694 (Tex. Crim. App. 1982)). While the accused must knowingly and intelligently make the choice to represent himself, it need not be wise. *Id*. The accused must be permitted to "conduct his own defense ultimately to his own detriment," if that is his informed decision. *Id.* (citing *Faretta*, 422 U.S. at 834). The appropriate question is whether the accused is competent to choose the endeavor to represent himself *Id*.

eyes open.'" *Id*. (quoting *Faretta*, 422 U.S. at 835). Here, appellant clearly and unequivocally asserted his right to self-representation at the February 3, 2009 pretrial hearing; therefore, the right had attached. *See id*.

### 3. Whether Appellant Voluntarily, Intelligently, and Knowingly Waived His Right to Counsel

The record does not show that anyone coerced appellant into waiving his right to counsel. In fact, during the pretrial hearing, defense counsel told the trial court that appellant "indicate[d] very strongly in no uncertain terms his desire to represent himself." In response, appellant told the trial court, "I'm going to be representing myself." Thus, we conclude that appellant voluntarily waived the right to counsel. *See Collier*, 959 S.W.2d at 626 (stating that "[t]he decision to waive counsel and proceed *pro se* is made . . . 'voluntarily' if it is uncoerced") (citing *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993)).

"The decision to waive counsel and proceed *pro se* is made 'knowingly and intelligently' if it is made with a full understanding of the right to counsel, which is being abandoned, as well as the dangers and disadvantages of self-representation." *Id*. (citing *Faretta*, 422 U.S. at 834-36); *see* TEX. CODE CRIM. PROC. ANN. art. 1.051(g) (Vernon Supp. 2009).[8] "'The record must show, or there must be an allegation and evidence which must show, that an accused was offered counsel but intelligently and understandingly rejected the offer.'" *Goffney v. State*, 843 S.W.2d 583, 584-85 (Tex. Crim. App. 1992) (quoting *Carnley v. Cochran*, 369 U.S. 506, 516 (1962))

---

[8]Article 1.051(g) states, in relevant part, "If a defendant wishes to waive the right to counsel for purposes of . . . proceeding to trial, the court shall advise the defendant of the nature of the charges against the defendant and, . . . the dangers and disadvantages of self-representation." TEX. CODE CRIM. PROC. ANN. art. 1.051(g) (Vernon Supp. 2009)

The record reflects that before the trial court granted appellant's request to represent himself, it elicited from him that he (1) was thirty-seven years old and had a seventh-grade education, (2) had no history of mental or psychiatric disorders or treatment, and (3) had no disabilities or physical-health problems. Dr. Skop's report showed that he (1) was never in special education, (2) left school after getting married, (3) worked as a self-employed painter, (4) had an "average range" of intelligence, (5) indicated he would like to represent himself, (6) is currently competent to stand trial, and (7) appeared to have a factual as well as rational understanding of the proceedings he is likely to face. The trial court told appellant that he had a constitutional right to have an attorney represent him and that if he was too poor to hire one, he had a constitutional right to have a lawyer appointed to represent him at no cost to him. Despite this admonishment, appellant wanted to represent himself. Thus, the record reflects appellant waived the right to counsel with a full understanding of the right.

The court of criminal appeals has stated that "[w]hen advising a defendant about the dangers and disadvantages of self-representation, the trial judge must inform the defendant 'that there are technical rules of evidence and procedure, and he will not be granted any special consideration solely because he asserted his *pro se* rights.'" *Williams*, 252 S.W.3d at 356 (quoting *Johnson v. State*, 760 S.W.2d 277, 279 (Tex. Crim. App. 1988)). In this case, the trial court informed appellant that by representing himself, he would be "held to the same standard as any other attorney" and that he was expected to comply with all the rules of court, rules of procedure, and rules of evidence. The trial court advised appellant about the punishment range and that robbery was a second-degree felony. The trial court advised him of the rights he would be giving up by representing himself. Thus, appellant's decision to waive counsel and proceed *pro se* was made with

9

a full understanding of the dangers and disadvantages of self-representation.

Considering the totality of the circumstances, the record established that appellant knew what he was doing and that his choice to waive counsel and proceed *pro se* was "'made with eyes open.'" *Id*. (quoting *Faretta*, 422 U.S. at 835-36). Therefore, we hold that his waiver of the right to counsel was made knowingly, intelligently, and voluntarily. Issue one is overruled.

## B. Competency to Engage in Self-Representation

In issue two, appellant contends the trial court erred when it implicitly found that he was competent to represent himself.

### 1. Applicable Law

In *Indiana v. Edwards,* the United States Supreme Court considered whether the United States Constitution requires a state trial judge to allow a mentally ill defendant, upon request, to proceed *pro se* at trial. 128 S.Ct. 2379, 2383 (2008). The Court recognized a "mental-illness-related limitation on the scope of the self-representation right." *Id*. at 2384. In interpreting the Court's decision in *Edwards*, our court of criminal appeals stated that the *Edwards* Court held that

> the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky*[9] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

---

[9]In *Dusky v. United States*, the Supreme Court defined the constitutional standard for competence to stand trial: "[1] whether [the accused] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and [2] whether he has a rational as well as factual understanding of the proceedings against him." 362 U.S. 402, 402 (1960). This standard is codified in article 46B.003(a) of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a) (Vernon 2006).

*Chadwick v. State*, Nos. PD-0250, 0251-09, 2010 WL 1780053, at \*2 (Tex. Crim. App. May 5, 2010) (quoting *Edwards*, 128 S.Ct. at 2387-88). In reaching this conclusion, the *Edwards* Court took into account the erratic character of mental illness and determined that "the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards*, 128 S.Ct. at 2387.

In deciding *Edwards,* the Court declined to adopt the more specific standard proposed by the State of Indiana, stating that such a standard would "deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury." *Id*. at 2388. "The Court held 'only that lack of mental competence can under some circumstances form a basis for denying the right to proceed *pro se*.'" *Chadwick*, 2010 WL 1780053, at \*2 (quoting *Edwards*, 128 S.Ct. at 2394 (Scalia, J., dissenting)).

"As the Supreme Court noted in *Edwards,* the trial judge is in the best position to make the decision of whether a mentally ill defendant is competent to proceed *pro se*." *Id*. (citing *Edwards*, 128 S.Ct. at 2387). Accordingly, because "this is a mixed question of law and fact that turns on an evaluation of credibility and demeanor, we review the trial judge's ruling for an abuse of discretion." *Id*. (citing *Edwards*, 128 S.Ct. 2387-88). "We afford almost total deference to a trial judge's rulings on mixed questions of law and fact when the resolution of the issue turns on an evaluation of credibility and demeanor." *Id*. (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). "We view the evidence in the light most favorable to the trial judge's ruling." *Id*. (citing *Guzman*, 955 S.W.2d at 89). "And we will imply any findings of fact supported by the evidence and necessary to support the trial judge's ruling when the judge failed to make explicit findings." *Id*. (citing *Guzman*,

11

955 S.W.2d at 89).

In this case, the trial court found that appellant was competent to stand trial. However, because appellant sought to conduct the trial himself, we are bound by *Edwards,* wherein the Court held that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings themselves." *Edwards*, 128 S.Ct. at 2388.

A case which helps to resolve whether appellant was competent to conduct trial proceedings himself is *Chadwick v. State*, 277 S.W.3d 99 (Tex. App.–Austin 2009), *aff'd*, 2010 WL 1780053, at *3. In that case, the trial court found Chadwick incompetent to stand trial for charges of attempting to take a weapon from a peace officer and assault on a public servant. *Id*. at 101-02. The trial court ordered Chadwick committed to a state hospital, and after his competency to stand trial was restored, the court denied his request for self-representation. *Id*. at 102. He was represented by counsel at trial, and the jury found him guilty. *Id*. On appeal, he argued "that the trial judge improperly refused to allow him to proceed *pro se* after his competency to stand trial was restored." *Chadwick*, 2010 WL 1780053, at *1. In affirming the trial court's ruling, the court of appeals stated, in relevant part:

> The trial court had sufficient evidence before it to support a finding that Chadwick was incompetent to represent himself. At the . . . pre-trial hearing and on the first day of trial, Chadwick interrupted his attorney several times and personally argued several motions that his attorney did not adopt. This gave the trial court the opportunity to observe the extent of Chadwick's ability to conduct his own defense at trial. Chadwick jumped from one topic to another, devoted most of his time to ad hominem attacks on the prosecutor, the judge, the bailiffs, judges from his prior cases, and other county and state officials. Many of his arguments were simply conclusory, while others were incoherent. . . .

12

\* \* \* \*

> The trial court also had before it several incoherent written motions that Chadwick had filed pro se.
>
> Given all of the foregoing, the trial court could have reasonably concluded that Chadwick was not competent to represent himself and that, if he had been allowed to do so, he would not have been able to receive a fair trial.

*Chadwick*, 277 S.W.3d at 104-05 (citing *Edwards*, 128 S.Ct. at 2387).

Chadwick argued to the court of criminal appeals that the Austin Court of Appeals erred (1) in its application of *Edwards* and (2) by implying findings of fact supporting the trial court's ruling. *Chadwick*, 2010 WL 1780053, at \*1. In affirming the appellate court, the court of criminal appeals noted that the appellate court "correctly observed that *Edwards* controlled the case, and that under *Edwards*, the individual States may insist that a defendant who is competent to stand trial-but incompetent to conduct his or her own defense-be represented by counsel." *Id*. at \*2.

The court of criminal appeals also stated that "[t]he evidence in this case supported implied findings of fact that Chadwick's mental illness was severe enough to render him incompetent to proceed *pro se*, even though the trial judge deemed competent him [sic] to stand trial." *Id*. at \*3. The court noted that at the pretrial hearing, "Chadwick objected several times, even as the judge granted the motions filed by his attorney. . . ." *Id*. At the end of the pretrial hearing, Chadwick asked the trial court, "'Would it be inappropriate to curse you with every Israeli curse there is?'" *Id*. Chadwick, ignoring his counsel's advice not to curse the judge, stated, "'May Yahweh curse you till the end and may I put an eternal indictment on you and I will prosecute you to eternity.'" *Id*. Chadwick also refused to come to court on the day trial was set to begin. *Id*. He came to court only after he was allowed to make a video in the jail, documenting various grievances. *Id*.

13

The court of criminal appeals stated that based upon the evidence—Chadwick's behavior before the trial court, his refusal to come to court on the first day of his trial, and the incoherent *pro se* motions, and viewing the evidence in the light most favorable to the trial court's ruling, "we conclude that the judge did not abuse his discretion." *Id*. The court held "that the court of appeals did not err in implying findings of fact supporting the trial judge's decision to deny Chadwick's request to represent himself." *Id*. (citing *Guzman*, 955 S.W.2d at 89).

In this case, voir dire began on February 3, 2009. During appellant's opening statement to the venire members, he stuttered and twice told them that he was "kind of nervous." Among other things, he told them about the burden of proof: "[J]ust because you are charged with a—with an offense, it doesn't mean that you're aggravated guilty. You know what I'm saying? They have to prove it beyond a reasonable doubt and . . . the indictment . . . is an allegation, they have to prove to you." Later, he also told them, "You see a person is not . . . guilty just because he's arrested. Or even if, you know, he's in court." He also told them, "You came because I asked for a jury trial. You see? In order so you could sit on my case right here and say if I'm innocent or if I'm guilty and I will respect that, the decision, because I will try to do my best in a trial to explain everything. . . . All I'm asking you is to bring justice."

During the trial on the merits, the theme of appellant's opening statement to the jury was that because he was under the influence of drugs, the police assumed he was involved in the robbery. He told the jurors that he was at his mom's house and when he returned to his apartment complex, the police told him that his car was involved in a robbery. Appellant told the jurors, "But having a drug problem and doing a robbery's two different things."

14

During cross-examination, appellant contested his identity as the alleged robber. He called his wife to testify in his defense. He also made a closing argument in which he challenged his identity as the alleged robber. During the punishment phase, he cross-examined witnesses and made a brief closing argument.

**2. Analysis**

Unlike the defendant in *Chadwick*, appellant did not refuse to show up for trial, did not curse the trial judge, and did not resort to ad hominem attacks. The record shows that he tried to establish a defense and that he was polite to the trial court, the jury, and the prosecutor. Dr. Skop's evaluation showed that appellant was not suffering from a severe mental illness or defect at the time of the offense.

Accordingly, given the evidence in the record of appellant's behavior before the trial court, and viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the evidence supports implied findings of fact that appellant did not suffer from severe mental illness to the point that he was not competent to conduct trial proceedings by himself. Therefore, we hold that the trial court did not abuse its discretion in granting appellant's request for self-representation. Issue two is overruled.

### IV. Conclusion

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
3rd day of June, 2010.